UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

In re:  John Walter Roush
        June Margaret Roush

       Debtors                           CASE NO. 05-61682

                                              CHAPTER    7

Commonwealth Ambulance Service, Inc.

       Plaintiff

vs.

John Walter Roush
June Margaret Roush

       Defendants                     Adv. Proc. No. 06-03103

**MEMORANDUM-OPINION**

THIS ADVERSARY PROCEEDING is before the Court after the conclusion of a trial on the merits of the cause of action brought by Plaintiff against Defendant June Margaret Roush (hereinafter "Defendant") under 11 U.S.C. §523(a)(2)(A). The Court has previously granted Plaintiff a Default Judgment against Defendant John Walter Roush. For the reasons set forth below, the Court determines that Defendant's debt to Plaintiff, if any, is dischargeable. By virtue of 28 U.S.C. §157(b)(2)(J) this is a core proceeding. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052.

<u>FINDINGS OF FACT</u>

The sole shareholder and chief executive of Plaintiff, Randall Powell, is an experienced businessman. From 1981 to 1996, Mr. Powell made Plaintiff into the largest ambulance service company in Kentucky, contracting with nursing homes and hospitals and ultimately fielding 72

ambulances. During that time, Mr. Powell maintained a lending relationship with at least one financial institution and became familiar with the kinds of documents and other information that lenders require of business borrowers, such as tax returns and profit and loss statements. Mr. Powell sold the assets of his ambulance service business to a national company in December of 1996. For the past six years, Mr. Powell has owned and managed a firearms dealership in Shelbyville, Kentucky.

Sometime in 2000 or 2001, Mr. Powell began frequenting Sir Churchill's Pub & Eatery, an English-style pub located in Jeffersontown, Kentucky (the "Pub"). The Pub was owned by Sir Churchill's English Pub & Eatery, Inc. (the "Pub Corporation"), of which Defendant was the majority shareholder. Mr. Powell became friendly with Defendant, Mr. Roush and Defendant's mother. At some point in 2001, Defendant told Mr. Powell that the Pub was having financial difficulties. Mr. Powell or Plaintiff loaned Defendant or the Pub Corporation[1] $20,000.00. Defendant or the Pub Corporation made monthly payments of around $200.00 a month on that debt for the next nine to twelve months.

Around a year after the making of the $20,000.00 loan, Mr. Powell had a conversation with Defendant in which she told him that the Pub was having financial difficulties and needed certain improvements such as central air conditioning and a paved parking lot. Mr. Powell again offered to help and ultimately agreed to loan the Pub Corporation $116,000.00. Mr. Powell and Defendant discussed the use of the funds–to pay off a Stockyards Bank loan previously taken out to finance the business (the "Stockyards Bank Loan"), install central air conditioning, pave the parking lot and get back in good standing with vendors. Those proposed uses, however, were not memorialized in the terms of the promissory note executed by the Pub Corporation on April 22, 2002 (the "Promissory Note").

Mr. Powell intended that Defendant and her husband personally guaranty the $116,000.00 loan, but the only writing to that effect consists of Defendant's and her husband's signatures on the Promissory Note "as personal guarantors" and one line of the Promissory Note that states as follows: "This note being made between Commonwealth Ambulance Service Inc. (Note holder) and Sir Churchill's English Pub & Eatery Inc. (Borrower), with personal guarantee by John W. Roush and

---

[1]The record is not clear as to the lender or the borrower.

June M. Roush."

Mr. Powell and Defendant also intended that the Promissory Note be secured by the personal property located at the Pub (the "Pub Personal Property"). The Promissory Note refers to a videotape of such personal property. Defendant testified, credibly, that she believed, and in fact continues to believe, that Plaintiff would ultimately receive a first priority lien on the Pub Personal Property.[2] Mr. Powell also believed that Plaintiff would receive a first priority lien on the Pub Personal Property, although he admitted in his testimony that he did not specifically inquire as to the existence of liens on the Pub Personal Property other than that of Stockyards Bank

Mr. Powell did not undertake any meaningful due diligence or take other steps to protect himself in making the $116,000.00 loan to the Pub Corporation. Although he allegedly asked Defendant for financial information, he funded the loan without having received such information. He did not engage an attorney to assist him with the loan, including to do something as simple as to check the Kentucky Secretary of State's website for UCC filings with respect to the Pub Personal Property.[3] He prepared the Promissory Note himself. Furthermore, although the Promissory Note was executed as of April 22, 2002, Plaintiff did not file a UCC financing statement encumbering the Pub Personal Property ("Plaintiff's UCC") until February 13, 2004, nearly two years later.

Defendant testified, credibly, that proceeds from the $116,000.00 loan were used to pay off the Stockyards Bank Loan, to pave part of the Pub's parking lot and to pay off other debts. The parties agree that approximately fourteen monthly payments of $978.87 were made on the loan. The Pub continued to experience financial difficulties and closed on September 30, 2004. Defendant testified, credibly, that she left all of the Pub Personal Property at the Pub at that time and that she has not entered the business premises since. There is no evidence in the record as to the whereabouts of the Pub Personal Property at this time, including whether Plaintiff made any attempt to take possession of the same.

---

[2] Mr. Powell and Defendant were aware that Stockyards Bank had a lien against the Pub Personal Property, but understood that such lien would be released when the Pub Corporation used some of the proceeds of Plaintiff's $116,000.00 loan to pay off the Stockyards Bank Loan.

[3] Mr. Powell himself could have easily checked the website–he testified that he has a personal computer and that he knows what a website is.

At some time prior to borrowing the $116,000.00 from Plaintiff, the Pub Corporation borrowed money from a company called iDine Restaurant Group, Inc. ("iDine"). Apparently in connection with that loan, iDine filed a UCC financing statement on January 22, 2002, which encumbered the Pub Personal Property (the "iDine UCC"). Defendant testified, credibly, that she believed that the repayment arrangement with iDine required only that she permit iDine to place its credit-card machines in the Pub, which directed customer credit-card payments directly to iDine. iDine would then deduct a portion of the payments and return the balance to the Pub Corporation. Defendant testified, credibly, that she was not aware that iDine had also filed the iDine UCC. She also believes that the iDine loan was paid off with proceeds of the $116,000.00 loan from Plaintiff.[4]

At some time after borrowing the $116,000.00 from Plaintiff, the Pub Corporation borrowed money from a company called Advanceme, Inc. ("Advanceme"). In connection with that loan, Advanceme filed a UCC financing statement on February 16, 2004, which encumbered the Pub Personal Property (the "Advanceme UCC"). Defendant testified, credibly, that she believes that the arrangement with Advanceme was the same as that with iDine. Advanceme placed its credit-card machines in the Pub and customer credit-card payments went directly to Advanceme. She also was not aware that Advanceme had filed the Advanceme UCC.

## CONCLUSIONS OF LAW

Plaintiff seeks a determination from the Court that Defendant's debt to it is non-dischargeable under 11 U.S.C. §523(a)(2)(A). To obtain an exception from discharge under 11 U.S.C. § 523(a)(2)(A), a plaintiff-creditor must prove by a preponderance of the evidence, each of the following essential elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *See In re Rembert*, 141 F.3d 277, 280-81 (6th Cir. 1998). The debtor's intent is ascertained by looking at the totality of the circumstances, and all exceptions to discharge are to be strictly construed against the creditor. *Id.* at 281-282. Furthermore, the proper inquiry is whether a debtor *subjectively* intended to repay the

---

[4] iDine is not listed as a creditor in Defendant's Chapter 7 bankruptcy schedules. On the other hand, the iDine UCC does not appear to have been released.

debt, which requires a showing of actual or positive fraud, not merely fraud implied by law. *Id.* at 281. While a view to a debtor's overall financial condition is a necessary part of inferring whether or not the debtor incurred the debt maliciously and in bad faith, the hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith. *Id.*

As an initial matter, the Court questions whether Plaintiff's claim is properly brought against Defendant. Plaintiff looks to Defendant's purported guaranty of the Pub Corporation's debt as the basis of its claim.[5] Under Kentucky state law, a guaranty cannot be enforced unless it is in writing, signed by the guarantor, and contains provisions specifying the amount of the maximum aggregate liability of the guarantor and the date on which the guaranty terminates. KRS 371.065(1). Here, the purported guaranty consists only of the phrase "with personal guarantee by John W. Roush and June M. Roush" and the signatures of each of those persons "as guarantor" in and on the Promissory Note itself. In this Court's view, such minimal language would not meet the requirements of KRS 371.065(1).

Even if Defendant's purported guaranty were enforceable, however, the entire record in this case leads the Court to conclude that Plaintiff's claim under 11 U.S.C. §523(a)(2)(A) must fail because Defendant did not intend to deceive Plaintiff and intended to repay the $116,000.00 loan. Moreover, Plaintiff did not justifiably rely upon any statements of Defendant that might subsequently have turned out to be incorrect.

First, Defendant did not know that the Pub Personal Property was encumbered by any party other than Stockyards Bank when she agreed to give Plaintiff a first priority lien in the Pub Personal Property and accepted the $116,000.00 loan from Plaintiff.[6] Based on her testimony, it is clear to this Court that she is not a sophisticated business person. Although the Pub Corporation had previously borrowed money from iDine, the nature of that transaction–repayment through use of iDine's credit-card machines–was such that Defendant might reasonably have assumed that no other

---

[5]It is possible that Plaintiff is attempting to proceed against Defendant by "piercing the corporate veil." Although the facts of this case might tend to support Plaintiff's efforts in that regard, Plaintiff has not formally enunciated that theory in its Complaint.

[6]The Court also notes in passing that it is entirely possible that Plaintiff in fact *does* hold a first priority security interest in the Pub Personal Property. The iDine loan appears to have been paid off, which would warrant the release of the iDine UCC. Plaintiff's UCC was filed before the Advanceme UCC.

security was needed for the loan.

Second, if it was so important to Plaintiff that it obtain a first priority lien on the Pub Personal Property, it should have conducted its own UCC filing search. Mr. Powell, its principle officer and manager, is a sophisticated businessman. Rather than assuming[7] that Stockyards Bank held the only lien, Plaintiff could have simply gone to the Kentucky Secretary of State's website and used UCC filing search function there to obtain, in a matter of minutes if not seconds, a comprehensive list of UCC filings by the Pub Corporation. That Plaintiff failed to do so, and failed to take any other steps to protect its interests, leads the Court to conclude that Plaintiff did not justifiably rely on any statements of Defendant with respect to the $116,000.00 loan.

Finally, Plaintiff failed to produce any evidence that might lead the Court to conclude that Defendant did not intend to repay the $116,000.00. To the contrary, Defendant made approximately fourteen monthly payments of close to $1,000.00 each on that loan. That fact, in and of itself, is enough to establish a subjective intent on Defendant's part to repay the loan.

Because Plaintiff has failed to prove that Defendant subjectively intended to deceive it, that she did not intend to repay its loan to her, or that it justifiable relied upon any allegedly false representations, its claim under 11 U.S.C. §523(a)(2)(A) must fail for failure to carry the required burden of proof. A separate Order consistent with the foregoing has been entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

---

[7]As noted above, Mr. Powell testified that he did not ask Defendant about the existence of liens other than that of Stockyards Bank.

6